**AMERICAN CYANAMID COMPANY, Petitioner,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 85–4899.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1987.

---

Theodore L. Garrett, Covington & Burling, Washington, D.C., for petitioner.

Michael D. Rowe, U.S. Dept. of Justice, Lee M. Thomas, Admin., Laurence M. Groner, E.P.A., Washington, D.C., for respondent.

Before THORNBERRY, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

American Cyanamid Co. appeals a decision of the Administrator of the Environmental Protection Agency ("EPA") that it violated Louisiana's EPA-approved air pollution regulations and that the EPA may commence enforcement proceedings to determine American Cyanamid's liability and calculate a non-compliance penalty for the violation. We affirm the finding that American Cyanamid violated Louisiana's regulations, but we reverse the finding that the EPA may now commence enforcement proceedings, because American Cyanamid would not be in violation of Louisiana's proposed amended regulations. For greater clarity, we alter the usual order of a court opinion to set out in detail the controlling statutory scheme and then apply that scheme to the facts of the case before us.

## I. *The Clean Air Act*

The Clean Air Act ("Act"), 42 U.S.C. §§ 7401 *et seq*, provides a comprehensive scheme for controlling air pollution. In 1970, Congress amended the Act to reapportion responsibility between federal agencies and the states over pollution control.[1] Under the 1970 Amendments, the

---

1. We have noted before that the Act "establishes a program for air quality improvement that

EPA promulgates "National Ambient Air Quality Standards" ("NAAQS"), and each state may adopt a "State Implementation Plan" ("SIP") to implement and maintain such standards within its borders. *See* 42 U.S.C. §§ 7409(a)(1) (NAAQS); 7410(a)(1) (SIPs). A state, through its SIP, may order particular factories and other sources of pollution to reduce emissions to a target level by a certain date. 42 U.S.C. §§ 7407; 7410(a)(2). The states that adopt SIPs must submit them to the EPA for approval, and the Act provides specifically that the EPA "shall, within four months" approve a proposed SIP that meets certain statutory requirements. 42 U.S.C. § 7410(a)(2).

■ Congress recognized that a state might need to revise its SIP to reflect changed local needs, new technology, or other developments. Accordingly, the Act provides that a state may propose revisions of its SIP to the EPA. As with original proposals, the EPA must approve revisions that satisfy the requirements listed in 42 U.S.C. § 7410(a)(2). *See* 42 U.S.C. § 7410(a)(3). Section 7410(a)(3) does not specify how long the EPA has to accept or reject a proposed *revision*. In *Duquesne Light Co. v. EPA*, 698 F.2d 456, 471 (D.C. Cir.1983), however, the court held that the EPA must act on proposed revisions within four months, the same time given for rulings on original proposals. *See also Council of Commuter Organizations v. Gorsuch*, 683 F.2d 648, 651 n. 2 (2nd Cir.1982) and *Council of Commuter Organizations v. Thomas*, 799 F.2d 879, 888 (2nd Cir.1986) (EPA must act on revisions within four months); *but see United States v. National Steel Corp.*, 767 F.2d 1176, 1182 n. 1 (6th Cir.1985) (four month rule applies only to "general state plans" and not to revisions). We agree with the D.C. Circuit and the Second Circuit and hold that the four month time limit for EPA action on original proposals also applies to proposed revi-

sions. To hold otherwise would intrude upon the logical pattern of the state and federal relationship set up in the statute which recognized in the time limit the important role of the states.

The EPA and the states have joint authority to enforce the approved SIPs. Emissions limitations may be enforced in many ways. The case before us involves 42 U.S.C. § 7420, which provides one of the mechanisms for enforcing SIPs. It provides that the EPA or a state may charge a "Noncompliance Penalty" against an entity that violates an SIP.

## II. *Noncompliance Penalties Under 42 U.S.C. § 7420*

The Act regulates emissions from "major stationary sources," ones with the capacity to emit more than 100 tons of air pollutants in a year. *See* 42 U.S.C. § 7602(j) (defining "major stationary source"); 40 C.F.R. § 66.3(g). Under 42 U.S.C. § 7420, the EPA may charge a noncompliance penalty against a major stationary source that violates "applicable legal requirements." *See* 42 U.S.C. § 7420(a)(2)(A)(i); 40 C.F.R. § 66.11. "Applicable legal requirements" means, among other things, the requirements of an "EPA—approved state implementation plan." 40 C.F.R. § 66.3(c)(1). Thus, when a state submits a revision for EPA approval, the existing SIP remains the standard by which compliance is measured until the EPA approves the revision. *Id.; Duquesne*, 698 F.2d at 470; *Train*, 421 U.S. at 92, 95 S.Ct. at 1488. That is, a proposed revision is not an "applicable legal requirement" unless and until the EPA approves it.

The first step in a § 7420 action is the sending by the EPA of a "Notice of Noncompliance," which briefly states why the EPA believes the recipient has violated an approved SIP.[2] The receipt of this Notice

reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government." *Florida Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir.1981). For a general history of the Act and its amendments, *see Train v. Natural Resources Defense*

*Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975) and *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**2.** As mentioned above, a state also may institute noncompliance proceedings under § 7420.

begins a so-called "Period of ... Noncompliance." 42 U.S.C. § 7420(d)(3)(C); 40 C.F.R. § 66.11(c). The EPA may collect a penalty only for violations that occur during the Period of Noncompliance; it may not collect for violations that occur before it issues a Notice of Noncompliance. 42 U.S.C. § 7420(d).

Next, the EPA or the recipient of the Notice calculates the amount of the Noncompliance Penalty. Section 7420 authorizes the EPA to collect a penalty equal to at least the economic value of noncompliance, that is, the amount the recipient saves by failing to comply with the SIP. 42 U.S.C. § 7420(d)(2)(A). The recipient must pay the penalty quarterly during the Period of Noncompliance. 42 U.S.C. § 7420(d)(2, 3).

One who receives a Notice of Noncompliance may challenge the Notice by showing that he is exempt from the regulation in question or that he is in compliance with the applicable legal requirements. 42 U.S.C. § 7420(b)(4); 40 C.F.R. § 66.13. One who contests the Notice may request a hearing before an Administrative Law Judge (ALJ). 42 U.S.C. § 7420(b)(4, 5); 40 C.F.R. § 66.13(a). The recipient may appeal an adverse decision of the ALJ to the Administrator of the EPA. The Administrator's decision, in turn, is appealable directly to the United States Court of Appeals. 42 U.S.C. § 7607(b)(1).

### III.  *Standard of Review of the Administrator's Decision*

We may reverse agency decisions that are "arbitrary, capricious, an abuse of discretion, ... not in accordance with law[,] in excess of statutory ... authority, [or] unsupported by substantial evidence." 5 U.S.C. § 706(2); *see also* 42 U.S.C. § 7607(d)(9). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *J.H. Rose Truck Line, Inc. v. ICC*, 683 F.2d 943, 948 (5th Cir. 1982).

As set out above, the EPA is required by the statute to approve a proposed SIP or revision if it meets the requirements of 42 U.S.C. § 7410(a)(2). Once approved, an SIP becomes part of the nationwide plan that either the EPA or the states can enforce. In our judicial review we give great deference to the EPA's interpretation of the statutory scheme that Congress entrusted it to administer. *Chevron U.S.A.*, 467 U.S. at 840, 104 S.Ct. at 2782; *State of Connecticut v. EPA*, 696 F.2d 147, 155 (2nd Cir.1982); *Quarles v. St. Clair*, 711 F.2d 691, 698 (5th Cir.1983). Such deference is justified because the EPA has developed special expertise in implementing and enforcing the Act. *Florida Power & Light*, 650 F.2d at 584–85. Thus, we may not substitute our own judgment for the EPA's, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), although we will disapprove EPA decisions that contradict the Act's plain meaning or intent. *Quarles*, 711 F.2d at 707.

With this standard of review in mind, we turn to the facts of the case before us.

### IV.  *Louisiana's SIP and the American Cyanamid Plant*

The EPA has established an NAAQS for ozone. *See* 40 C.F.R. § 50.9. Louisiana has adopted an SIP (the "Louisiana Air Quality Regulations" ("LAQR")) that, among other things, implements the EPA's ozone NAAQS. The EPA approved Louisiana's SIP on October 29, 1981.

To control ozone emissions, Louisiana regulates the storage of Volatile Organic Compounds in "large" tanks, that is, tanks with a capacity of more than 40,000 gallons. LAQR 22.3 directs that such tanks must be equipped with "submerged fill pipe[s]" and "one or more of the vapor loss control devices described [in LAQR 22.3.1.-1–22.3.1.4]." These devices include an internal floating roof (22.3.1.1), an external floating roof (22.3.1.2), a vapor gathering

---

Only the EPA charged American Cyanamid with a violation, so we confine our description of enforcement activities to those carried out by the EPA.

and disposal system (22.3.1.3), and "other equivalent equipment or means as may be approved by [Louisiana]." (22.3.1.4).

American Cyanamid owns and operates a chemical plant (the "Fortier Plant") in Westwego, Louisiana, near New Orleans. This plant has the capacity to emit more than 100 tons of pollutants per year, so it is a "major stationary source" of ozone pollution subject to the Act. American Cyanamid stores Volatile Organic Compounds in fourteen "large" tanks at its Fortier Plant.[3] These tanks together emit between 100 and 150 tons of hydrocarbons per year, a small part of the Fortier Plant's total air pollution. The major source of air pollution at the Fortier Plant is a "Waste Gas Disposal Stream," or "AOG Vent." LAQR 22.8 regulates emissions from the vent.

In 1977, the Fortier Plant emitted a total of 16,300 tons of pollution. Of this, the Vent accounted for 13,200 tons. Louisiana's SIP called for American Cyanamid to reduce Vent emissions to 3,960 tons and overall plant emissions to 4,790 tons by the end of 1982. Also by the end of 1982, the company had to equip its fourteen storage tanks to comply with LAQR 22.3.

By the end of 1982, American Cyanamid reduced Vent emissions to 1,520 tons per year and total plant emissions to 2,408 tons, well below the target levels. It did not, however, install floating roofs or other equipment on the storage tanks, and it did not reduce emissions from the tanks to the 1982 target level.[4]

To remedy the situation at the storage tanks, American Cyanamid proposed the application of the so-called "bubble concept" at the Fortier Plant. Under the bubble, or emissions trading, concept, the entire plant would meet and even surpass the 1982 targets by means of the company offsetting "noncompliance" at one source within the plant with "supercompliance" at another source. For instance, the Louisiana SIP called for a 70 percent reduction in pollution from each source at the Fortier Plant to effect a 70 percent reduction at the plant as a whole. Application of the bubble concept would have achieved better than the 70 percent overall plant reduction, but American Cyanamid could have maintained or even increased pollution from its storage tanks if it reduced Vent emissions by enough more than 70 percent.

On May 6, 1982, Louisiana's Office of Environment Affairs ordered American Cyanamid "to achieve compliance with [LAQR 22.3 by December 31, 1982] by utilizing the bubble concept," thereby authorizing emissions trading at the Fortier Plant. On July 22, 1982, Louisiana submitted to the EPA the May 6 order as a proposed revision of its SIP.

The EPA's Regional Office investigated the proposed use of the bubble concept and forwarded it to EPA Headquarters with a recommendation to deny the revision. Over four years have now passed, and the EPA has not accepted or rejected the proposed revision.[5]

3. The company stores acrylonitrile in thirteen tanks and methanol in one tank. Both substances are volatile organic compounds as defined in LAQR 4.77.

4. American Cyanamid claims it thought that the EPA was about to issue new regulations for the storage of acrylonitrile and that such regulations would alter the equipment requirements of LAQR 22.3. The company feared that any modifications it made to its tanks would not satisfy the new regulations. Thus, it hoped to delay tank modifications until the EPA issued its new acrylonitrile regulations.

5. American Cyanamid notes that Louisiana submitted its revision on July 22, 1982, more than four months before December 31, 1982, the date by which it had to comply with the existing SIP.

Thus, if the EPA had approved the revision within four months, American Cyanamid would have complied with Louisiana's SIP on schedule. After Louisiana submitted its proposed revision on July 22, 1982, however, the EPA's Regional Office requested additional data it needed in order to evaluate the proposal. Louisiana's Office of Environmental Affairs corresponded with the EPA about the proposed bubble until early 1984, often providing additional information about American Cyanamid's storage tanks. Thus, the EPA argues that Louisiana completed its proposal of revision in early 1984 rather than on July 22, 1982.

The ALJ found that "[o]n July 22, 1982, the 'bubble' method ... was sent to the [EPA] as a revision...." This finding could be taken as implying that Louisiana sent a completed pro-

### V. *The Notice of Noncompliance*

On September 28, 1984, the EPA issued a Notice of Noncompliance to American Cyanamid for violating LAQR 22.3 by failing to equip its fourteen storage tanks with appropriate devices.[6] American Cyanamid challenged the Notice, claiming (1) that it did not violate LAQR 22.3, because the bubble concept is an "equivalent ... means" under LAQR 22.3.1.4 and (2) that the EPA cannot institute § 7420 noncompliance procedures until it rejects the proposed revision. After a hearing, the ALJ upheld the Notice of Noncompliance, ruling that American Cyanamid violated LAQR 22.3 and that the EPA can determine the company's liability and calculate the noncompliance penalty even before it rejects the proposed revision. But the ALJ also ruled that the EPA cannot *collect* any penalty until it rejects the proposed revision. American Cyanamid appealed to the EPA's Chief Judicial Officer, who affirmed the ALJ. The company then filed a timely appeal in this Court.

### VI. *Compliance with LAQR 22.3*

■ American Cyanamid equipped its storage tanks with submerged fill pipes, as required by LAQR 22.3. In addition, LAQR 22.3, in its critical wording, requires at least one of the "vapor loss control *devices*" listed in LAQR 22.3.1.1–22.3.1.4 (emphasis added). American Cyanamid concedes that its tanks do not have internal floating roofs, external floating roofs, or vapor gathering and disposal systems. It argues, though, that the bubble concept constitutes "other equivalent ... means as may be approved by [Louisiana]." LAQR 22.3.1.4. According to American Cyanamid, the bubble itself is a "device" (or "scheme") that includes the super-effective emissions control equipment at the Vent. Webster's Dictionary defines "scheme" as a synonym for "device." Webster's Third New International Dictionary 618 (1981). It is significant that the State of Louisiana has taken the position throughout this litigation that the bubble concept satisfies the earlier unamended requirements of LAQR 22.3.

The EPA and its ALJ and Chief Judicial Officer, on the other hand, decided that the bubble analysis is not a "device" within the meaning of LAQR 22.3. According to the EPA, Cyanamid's bubble concept allows extra reductions at the Vent to offset *noncompliance* at the tanks. Thus, the state and the EPA disagree about what "devices" will satisfy LAQR 22.3.

We acknowledge Louisiana's important role under the CAA, especially in formulating SIPs. Moreover, we recognize that the bubble concept encourages emissions reduction in the most efficient manner and that specific equipment standards may increase the cost of pollution control. Nevertheless, we review the EPA Administrator's decision narrowly. The agency's interpretation—that the unamended LAQR 22.3 requires American Cyanamid to install physical equipment directly on its tanks—is not "clearly wrong or unreasonable" and does not contradict the regulation's plain meaning. It is, therefore, binding. *Quarles*, 711 F.2d at 707. Thus, we find that American Cyanamid cannot be in compliance with Louisiana's unamended SIP by use of the bubble concept. Compliance awaits Louisiana's proposed revised SIP if it is approved.

### VII. *The Effect of the EPA's Delay in Ruling on Louisiana's Proposed Revision*

The EPA sent American Cyanamid a Notice of Noncompliance on September 28, 1984. This Notice commenced the Period of Noncompliance for which the EPA may collect a penalty. An important fact, how-

---

posal on July 22. If Louisiana completed its revision on July 22, and if the EPA had approved the revision within four months, or before December 31, 1982, American Cyanamid would never have violated Louisiana's SIP.

**6.** As discussed in footnote 5, the parties dispute the effective date of Louisiana's proposed revision. The record is clear, however, that Louisiana submitted its completed, proposed revision before May 28, 1984—more than four months before the Notice of Noncompliance.

ever, complicates the EPA's case against American Cyanamid. More than four months before September 28, 1984, Louisiana submitted a proposed revision that, if approved by the EPA, would have authorized the emissions trade-off within the Fortier Plant. The EPA issued its Notice of Noncompliance without rejecting Louisiana's proposal, and the EPA even today, long after the statutory deadline, still has not acted on the revision.

As part of its enforcement proceedings against American Cyanamid, the EPA asks for a penalty from the company for noncompliance since September 28, 1984, although it promises to refund any penalties it collects, plus interest, if it someday approves Louisiana's revision. The EPA's ALJ and Administrator held that, in spite of the chance of eventual approval, the EPA may issue its Notice of Noncompliance, determine liability, and calculate the amount of the Noncompliance Penalty but that the EPA may not *collect* the penalty unless and until it rejects Louisiana's proposal. We do not accept a Congressional intention to give the EPA such a power when it is in clear and specific violation of the Act because of its failure to act on a proposed revision in the required time. We find that the EPA's statutory noncompliance affects not only its right to adjudicate tentatively the amount of the Noncompliance Penalty but also, and more important to this case, its authority to commence § 7420 proceedings.

### (a) *The Noncompliance Penalty*

◼ In *Duquesne*, the D.C. Circuit discussed Noncompliance Penalties against companies that violate existing SIPs but comply with pending proposed revisions. 698 F.2d at 470–72. As set out above, the EPA may collect a § 7420 penalty only for noncompliance that occurs after it issues a Notice of Noncompliance. *Duquesne* held that, when a revision has been pending for more than four months, the EPA must hold Noncompliance Penalties "in abeyance" until the EPA rejects the revision. *Id.* at 472. *Duquesne* went on, however, to explain that "[s]hould the EPA ultimately reject the SIP, the penalty should be calculated back to the deadline, with interest." *Id.*[7] The *Duquesne* rule would allow the EPA to charge American Cyanamid, with interest, for violations since September 28, 1984, if and when the agency rejects Louisiana's revision.[8] Thus, the *Duquesne* holding provides little or no incentive to the EPA to abide by § 7410's four-month rule; the EPA loses nothing by its contumaciousness.[9]

Moreover, *Duquesne* may encourage the EPA to reject revisions that it should accept. For instance, in the case before us, after the EPA charged American Cyanamid with noncompliance, it delayed action for several years on Louisiana's revision, which would legalize the company's alleged noncompliance. After this long delay, the EPA might be reluctant to approve Louisiana's revision and admit that American Cyanamid is not liable for noncompliance after all. In addition, under *Duquesne*, the EPA will collect penalties against American Cyanamid back to September 28, 1984 *if it rejects, but not if it approves,* Louisiana's revision. These incentives may distort the EPA's even-handed administration of the Act.

A critical element has thus far been given less than adequate emphasis in the earlier stages of this case and in other cases decided under the provisions of the Clean Air Act. Congressional intent is clear that it wished to establish a cooperative rela-

---

7. By "deadline," *Duquesne* refers to the end of the four month period within which the EPA must approve or reject a proposed revision.

8. *Duquesne,* of course, did not relieve the EPA of the duty of filing a Notice of Noncompliance to start the running of the Period of Noncompliance.

9. *Cf.* Dante, *Canto III,* in the Purgatorio (J. Ciardi trans. 1961) ("Those who die contumacious, it is true,/though they repent their feud with the Holy Church,/must wait outside here on the bank, as we do,/For thirty times as long as they refused/to be obedient....."). Under *Duquesne,* the EPA, unlike Dante's late repenters, pays no price for its contumaciousness.

tionship between the states and the federal government in setting clean air standards and enforcing those standards. Hence, the provisions for the state SIP and the requirement that the EPA had to act within a period of four months in approving or disapproving a state SIP or, as other cases have held and as we hold, in approving or disapproving the revision of a state SIP.

Where, as here, the state has proposed a revision to its SIP which clearly authorizes local businesses to act in accordance with it without running afoul of the Clean Air Act, the interest of the state itself is deeply involved in the required four month approval or disapproval of the proposed revision. It distorts the statutory scheme to place virtually full emphasis upon the business entity involved as a charged "polluter." The emphasis of the statute, rather, is upon the important role which the state plays in defining authorized emissions. Louisiana in this case did not propose a clearly unacceptable or unrealistic revision. The bubble is a reasonable concept under the Clean Air Act. Indeed, it has been approved by the EPA in certain situations,[10] although the EPA persists in refusing to act upon Louisiana's proposed recognition of the bubble concept. The issue then is not so much pollution by American Cyanamid but the default of the EPA in carrying out the congressional intent to work in close cooperation with the states in implementing standards and enforcing the Clean Air Act. We emphasize the importance of the EPA acting, not for the benefit of American Cyanamid, but for the benefit of the State of Louisiana which is by statute designated to play a significant cooperating role with the EPA.

Thus, we now hold that the EPA may not collect a penalty for the period between (1) four months after a state submits a proposed revision and (2) the date the EPA rejects that revision. This standard, of course, works in conjunction with the standard that the Period of Noncompliance be-

gins only with the Notice of Noncompliance. In the case before us, the EPA issued its Notice more than four months after Louisiana submitted its revision. Thus, the EPA may collect a penalty from American Cyanamid only for violations that occur if the EPA rejects Louisiana's revision and after such a rejection. The EPA admits that if it approves the revision, no penalty may be collected.

Our holding today does not bar the EPA from collecting Noncompliance Penalties in other situations. For instance, the interests of the state would have been properly protected if the EPA had issued its Notice of Noncompliance to American Cyanamid *before* Louisiana submitted its proposed revision. Then the EPA could have charged, calculated, and collected a Noncompliance Penalty from the date of the Notice until four months after Louisiana submitted its revision, when the penalty would cease. The EPA could then resume Noncompliance Penalties if and when it rejected the state's proposed revision.

Congress intended § 7420 not only to achieve effective compliance with the CAA but also "to prevent noncomplying sources from gaining an unfair advantage over complying sources with which they compete." H.R.Rep. No. 294, 95th Cong., 1st. Sess., *reprinted in,* 1977 U.S.Code Cong. & Ad.News 1077, 1083. If the EPA ultimately rejects the Louisiana revision, American Cyanamid might be said to have gained an advantage over competitors that complied with the unrevised SIP. *Duquesne* urged that sources of pollution, such as American Cyanamid in this case, might "benefit undeservedly" if they could escape § 7420 penalties while the EPA delayed action on revisions. 698 F.2d at 472. *Duquesne,* however, inadequately recognized the role of the states under the Act, as we pointed out above. Congress, in explaining the Act, found "that the prevention and control of air pollution ... is the primary responsibili-

---

**10.** We do not decide whether the EPA should approve Louisiana's revision, but we note that the EPA recently released a policy statement that endorses certain uses of the bubble concept

and discusses how the EPA will review emissions trading proposals. *See* 51 Fed.Reg. 43,814 (1986) (effective date Dec. 4, 1986).

ty of States and local governments...." 42 U.S.C. § 7401(a)(3). Thus, in the case before us, it was the State of *Louisiana,* not *American Cyanamid,* that proposed the bubble as a revision. If the EPA eventually rejects the revision, American Cyanamid will not benefit "undeservedly"; the state undertook to authorize Cyanamid and others to implement the bubble. If the EPA collects less than it could collect retroactively under the *Duquesne* ruling, it is because of its own failure to act within the time limits set by the Act.

The EPA's interpretation of § 7420 exposes American Cyanamid and similarly situated individuals and companies to the unacceptable risk that, contrary to state policy decisions authorized under the Act, they will be fined because of delays within the EPA. The agency's promise of reimbursement in the event of approval provides insufficient consolation or protection, especially to recipients that cannot afford to pay the Noncompliance Penalty. Yet, this protection certainly should not be limited in availability only to alleged polluters in financial difficulty; it must be available to all in the same situation.

### (b) *§ 7420 Proceedings*

We also hold that when the EPA issues its Notice of Noncompliance more than four months after a state proposes a SIP revision, the EPA may not commence § 7420 proceedings until it rejects the proposed revision. *Duquesne* takes a different approach. It allows the EPA to issue its Notice of Noncompliance, determine liability, and calculate the amount of the Noncompliance Penalty pending approval or rejection of the proposed revision. 698 F.2d at 470–72. In the case before us, the ALJ and the Administrator allowed the EPA to pursue such proceedings. American Cyan-

amid challenged the Notice of Noncompliance before the ALJ, the Administrator, and now this Court—at great expense to all parties. If the EPA approves Louisiana's revision, these efforts will have wasted the resources of the company and the government. Our holding eliminates the risk of such wasted effort in the future.[11]

### VIII. *Should We Order the EPA to Act?*

American Cyanamid asks us to order the EPA to act "promptly" on Louisiana's revision. The Agency argues that only a federal district court can order the EPA to act.

Title 42 U.S.C. § 7607(b)(1) gives Courts of Appeals jurisdiction over "review of the Administrator's action in approving ... any implementation plan" or revision, while 42 U.S.C. § 7604(a) gives district courts jurisdiction over civil actions "against the Administrator when there is alleged a failure of the Administrator to perform any act or duty ... which is not discretionary...."

There is no need in this case to decide if a Court of Appeals has the power to order the EPA to act. With our holding in this case, we perceive no urgent need to order EPA action within a certain time. American Cyanamid is free to sue in district court under § 7604 to force the EPA to act, and the district court could investigate the reasons for the EPA's delay and other factors before deciding whether to order EPA action.

### IX. *Conclusion*

Today's decision balances many Congressional concerns regarding the Clean Air Act: the states and the EPA share responsibility for improving air quality, and the EPA is required to act within certain time limits. Further, its action is compelled, not

---

11. The EPA argues that American Cyanamid may not complain about its delay, because the company could have sued in district court to force the agency to act on Louisiana's revision. *See e.g. Council of Commuter Organizations* (advising concerned citizens who complained about EPA's delay before approving a revised SIP for New York City's toll bridges that they may file such a suit to force agency action).

We reject the EPA's argument. A state submits an SIP revision to improve the attainment and maintenance of the NAAQS. The EPA must review a revision within four months whether or not the state or some other party sues to hasten its decision. A suit to force the agency to act is one remedy, but should not be the only remedy for delay, once the interests of the states themselves are recognized.

discretionary, in the sense that if a proposed plan or revision complies with the statutory requirements, it must be approved.

We hold that the EPA may not continue to prosecute its § 7420 action against American Cyanamid until and unless it rejects Louisiana's proposed revision.[12] If the EPA bursts American Cyanamid's bubble, it can then undertake to enforce Noncompliance Penalties against the company.[13]

The decision of the Administrator is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**12.** We realize that American Cyanamid already has litigated and lost the battle over compliance with unrevised LAQR 22.3. Our ruling, however, will protect against potentially wasteful litigation in the future.

**13.** If the EPA rejects Louisiana's proposed revision and charges American Cyanamid for violating the original SIP, American Cyanamid of course may appeal the agency's decision to reject. *See* 42 U.S.C. § 7607(b)(1).