**UNITED STATES of America**

v.

**ARKWRIGHT, INCORPORATED; Oce van der Grinten, N.V.**

**Civ. No. 87–2000–D.**

United States District Court,
D. New Hampshire.

June 10, 1988.

Cynthia G. Irmer, Land & Nat. Res. Div., Washington, D.C., Everett C. Sammartino, Office of U.S. Atty., Providence, R.I., Judith Katz, EPA, Washington, D.C., Timothy Williamson, EPA, Boston, Mass., for plaintiff.

Gregory L. Benik, Providence, R.I., for defendants.

## OPINION

DEVINE, Chief Judge.

Plaintiff United States Environmental Protection Agency ("EPA") seeks civil penalties and injunctive relief against defendants Arkwright Incorporated ("Arkwright") and its parent corporation, Oce van der Grinten, N.V. ("Oce"),[1] under section 113(b) of the Clean Air Act ("Act"), 42 U.S.C. § 7413(b).[2]

Defendants move for dismissal of the complaint, and plaintiff objects thereto. Rule 12(b)(6), Fed.R.Civ.P. Plaintiff cross-moves for partial summary judgment on the issue of defendants' liability, and defendants object thereto. Rule 56(b), Fed.R.

1. Oce van der Grinten ("Oce") was added as a party defendant on August 27, 1987, following this Court's Order of August 5, 1987.

2. This case was originally filed with the United States District Court for the District of Rhode Island on October 16, 1986. However, because a principal witness in this action is a court employee's spouse, the judges in the Rhode Island District Court recused themselves and transferred the case to this court under a July 17, 1987, order.

Civ.P. Plaintiff also requests oral argument. Because an oral argument would not aid the Court, the merits of both parties' motions are decided on the documents as filed. *See* Rule 11(g), Rules of the United States District Court for the District of New Hampshire. EPA's motion for oral argument (document no. 14) is denied.

Arkwright, a wholly owned subsidiary of Oce, is a plastic film surface coating plant in Fiskeville, Rhode Island. Paper surface coating lines within the company's manufacturing process generate volatile organic compounds ("VOC"), which create smog when emitted into the atmosphere. The Act regulates VOC emission levels to attain safe "national ambient air quality standards" ("NAAQS") throughout the country and requires each state to formulate a "state implementation plan" ("SIP") for local realization of the NAAQS.

EPA approved Rhode Island's original SIP in 1981. Included in the SIP is section 19.3.1 of the Rhode Island Department of Environmental Management ("RIDEM") Air Pollution Control Regulation No. 19 ("Regulation No. 19"), which limits these ozone emissions to no more than 2.9 pounds of VOC per gallon of surface coating (minus water) by July 1, 1985. Arkwright's initial plan for complying with Regulation No. 19's VOC emission goals was rejected by RIDEM in 1983 because the State did not have the resources to supervise compliance. Plaintiff's Motion for Partial Summary Judgment [hereinafter "Plaintiff's Motion"] at 4. The company, RIDEM, and EPA then agreed to have a federally-sponsored consultant determine if Arkwright was capable of meeting the Regulation No. 19 emission limits. In September 1984 the consultant found that even though compliance was technically feasible, Arkwright could not afford the Reasonably Available Control Technology ("RACT"). Based on these findings, Arkwright and RIDEM entered into negotiations to reach a satisfactory compromise compliance schedule for Arkwright. The parties signed a consent agreement in June 1985, amended it in September, and submitted it to EPA for approval as a proposed SIP modification on November 18, 1985. Meanwhile, EPA was preparing to issue a Notice of Violation ("NOV") to Arkwright for continuing to exceed the July 1, 1985, emission level deadline contained in the original SIP. Even though it had just received an SIP modification proposal from the State, EPA sent the NOV to Arkwright on November 22, 1985.

In response to the SIP modification proposal, EPA reexamined the consultant's study of Arkwright's ability to meet RACT. EPA disagreed with the consultant's conclusions and found that Arkwright could afford to meet the Regulation No. 19 standards through the company's parent and subsidiary corporate resources. Plaintiff's Motion at 7. Nonetheless, the agency did not publish its proposed disapproval of the Arkwright SIP revision in the Federal Register until August 1, 1986, and its final rejection until October 19, 1987. During this review period, Arkwright corporation operated in violation of the original SIP emission levels, but in compliance with the terms of the emission schedule negotiated with Rhode Island.

In the instant motion, EPA seeks injunctive relief and enforcement of the Act's civil penalties for Arkwright's refusal to respond to the NOV and to force the company to comply with the terms of Regulation No. 19 in the original SIP. Because Arkwright agrees that it was exceeding the original July 1, 1985, emission levels at the time EPA issued its NOV, plaintiff requests the Court to award partial summary judgment on the issue of defendants' liability. Defendants argue that because Arkwright was complying with an alternate VOC emission schedule authorized by RIDEM, they should not be held liable for violating the Act as a matter of law. Defendants assert that Regulation No. 19 allows RIDEM to impose alternative compliance deadlines on a case-by-case basis. Defendants' Objection to Plaintiff's Motion for Partial Summary Judgment [hereinafter "Defendants' Objection"] at 3.

Alternatively, defendants argue that plaintiff's failure to meet its statutory deadlines warrants dismissal pursuant to

Rule 12(b), Fed.R.Civ.P., and under the principles of equitable estoppel.

## I.

■■■ As an initial matter, Oce opposes plaintiff's motion for summary judgment on the ground that the Court lacks personal jurisdiction over Oce.[3] EPA therefore has the burden of proving the facts necessary to sustain jurisdiction over the defendant. *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 904 (1980) (citing *McNutt v. GMAC*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). To meet this burden, plaintiff must make a prima facie showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits. Plaintiff's allegations of jurisdictional fact are construed in its favor. *Ealing Corp. v. Harrods, Ltd.*, 790 F.2d 978, 979 (1st Cir.1986).

■■■ For jurisdiction over Oce to be appropriate, Oce must be subject to the jurisdiction of Rhode Island's state courts under the relevant long-arm statute. Rule 4(e), Fed.R.Civ.P.; *see Wehner v. Syntex Agribusiness, Inc.*, 15 Envtl.L.Rep. (Envtl.L. Inst.) 20346, 20347 (E.D.Mo.1985); *see also* 4 *Wright & Miller* § 1075 at 494–95. Rhode Island's long-arm statute, R.I.Gen. Laws § 9–5–33 (1985 reenactment)[4] allows the exercise of jurisdiction over foreign corporations up to constitutional limits. *Almeida v. Radovsky*, 506 A.2d 1373, 1374 (R.I.1986). In determining whether the assertion of jurisdiction comports with due process, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Nicholas v. Buchanan*, 806 F.2d 305, 307 (1st Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985)). A defendant will be amenable to in personam jurisdiction if it has purposefully availed itself of the privileges and protections of a state's laws and if its conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there. *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

■■■ Although it appears that Oce, as an independent entity, does not have the minimum contacts with the State of Rhode Island necessary to allow the exercise of the Court's jurisdiction,[5] plaintiff argues that Oce has such pervasive control over Arkwright that their corporate separateness should be disregarded for purposes of asserting jurisdiction over Oce. As a general rule, the mere fact that a relationship exists between a parent corporation and its subsidiary will not subject the nonresident corporation to jurisdiction in the forum state if the nonresident is not otherwise present there. 2 J. Moore & J. Lucas, *Moore's Federal Practice ("Moore's")* ¶ 4.41–1[6] (1988). However, the Court

3. Oce originally raised the jurisdictional defense in its answer; thus, the issue is properly before the Court. Rule 12(b), Fed.R.Civ.P.; *Kerr v. Compagnie de Ultramar*, 250 F.2d 860, 864 (2d Cir.1958). Although Oce's challenge to the Court's jurisdiction is now raised in response to the plaintiff's motion for summary judgment, the appropriate procedural vehicle to challenge the Court's jurisdiction is a dismissal motion. Therefore, the Court treats defendant's response as such a motion and applies the appropriate legal standard. *See generally* 10 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure ("Wright & Miller")* § 2713 at 608–13 (1983); *see also Lavrov v. NCR Corp.,* 600 F.Supp. 923, 929 (S.D.Ohio 1984).

4. R.I.Gen.Laws § 9–5–33 (1985 reenactment) provides in relevant part:

(a) every foreign corporation ... not a resident of this state ... that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state ..., and the courts of this state shall hold such foreign corporation ... amenable to suit in Rhode Island in every case not contrary to the provisions of the Constitution or laws of the United States.

5. The affidavit of counsel for the Government asserts only in relation to Rhode Island that Oce's 1986 First Quarter Report states it has an office in Providence, Rhode Island. Affidavit of Cynthia G. Irmen, Exhibit B. However, there is no allegation that this document is not actually referring to Oce's subsidiary, Arkwright, and, in fact, is contradicted by the Government's Exhibit A, which states that Oce holds no properties in the United States. *Id.* Exhibit A at 21.

may assert jurisdiction over a nonresident parent corporation if the parent has ignored the subsidiary's separate corporate existence. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); *Escude Cruz, supra*, 619 F.2d at 905. There is a presumption of corporate separateness which may only be overcome by clear evidence that the parent controls the subsidiary. *Escude Cruz, supra*, at 905.

In *Cannon*, the United States Supreme Court stated that although a parent owns all of the capital stock and dominates a subsidiary, the veil will not be pierced if "the existence of the [subsidiary] as a distinct corporate entity is ... in all respects observed." *Cannon, supra*, 267 U.S. at 335, 45 S.Ct. at 251. The First Circuit Court of Appeals has stated that plaintiff must show that the parent exercises the type of control "necessary to ascribe to it the activities of the subsidiary" in order to pierce the veil. *Escude Cruz, supra*, 619 F.2d at 905 (quoting *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 493 (5th Cir.1974)); *cf. de Walker v. Pueblo Int'l, Inc.*, 569 F.2d 1169, 1173 (1st Cir.1978) (corporate separateness found when parent and subsidiary are completely segregated fiscally and operationally).

In determining whether the parent's control is pervasive enough for the corporate entity of the subsidiary to be disregarded, the Court considers the following factors: (1) intermingling of the corporations' properties, accounts and records, employees, and business transactions; (2) failure to observe corporate formalities (i.e., if the directors and officers of each corporation are common, separate meetings and delineation of the respective capacities in which the common officials serve should be observed); (3) inadequate capitalization of the subsidiary; (4) enterprises not held out to the public as separate entities; (5) policies of the subsidiary directed primarily to the parent; and (6) the parent's control over the day-to-day operations of the subsidiary. *See, e.g., In re Alleged PCB Pollution*, 675 F.Supp. 22, 26 Env't Rep.Cas. (BNA) 2089, 2096 (D.Mass.1987); *Wehner,*

*supra*, 15 Envtl.L.Rep. at 20347; *United States v. Bliss*, 108 F.R.D. 127, 131 (E.D. Mo.1985); *see also Escude Cruz*, 619 F.2d at 905.

In the instant case, it is undisputed that since 1978 Oce has owned one hundred percent of Arkwright's stock, that Arkwright's capital and operating budgets are subject to Oce's approval, that Oce performs internal audits of Arkwright and in 1981 directed that Arkwright not be independently audited, and that Oce has guaranteed Arkwright's loans and lines of credit. In addition, although disputed by Oce, the following allegations are supported by record evidence and, construed in the light most favorable to the plaintiff, support maintenance of Oce in the suit. *See Maritime Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981) (prima facie showing of jurisdiction suffices regardless of any controversy presented by defendant). Plaintiff alleges that Arkwright was undercapitalized at the discretion of Oce, *see* Plaintiff's Second Brief in Support of Motion for Summary Judgment ("Plaintiff's Brief"), Exhibit F (deposition of James Fish, Vice President and Treasurer of Arkwright) at 95–104; that Oce orchestrated the declaration and payment of a $6.6 million dividend from an Arkwright subsidiary; and that Oce ordered part of the dividend to be paid to Arkwright to correct the undercapitalization, with payment of the remainder going directly to Oce, *id.* Exhibit I (telexes between Arkwright and Oce regarding payment of dividend).

EPA also asserts that Oce controls all significant financial decisions made by the Arkwright board of directors. Prior to 1982 or 1983, plaintiff asserts that Arkwright's board of directors was a "figurehead" board, which performed no real duties, but merely carried out the formalities necessary to corporate life. *Id.* Exhibit C (Fish deposition at 34–35). In 1982–83, although Arkwright went to a bifurcated board of directors, with the Oce directors serving as class "B" directors and the Arkwright officials serving as class "A" directors, plaintiff asserts that any signifi-

cant financial decisions made by Arkwright had to be approved by the class "B" directors. Such decisions included, for example, opening a line of credit, securing a loan, and entering into a lease for more than $50,000 and longer than three years. *Id.* Exhibit E (Fish deposition at 76–80). Additionally, Arkwright could not make a capital expenditure in excess of $50,000 without Oce's approval. Thus, the Government asserts that Arkwright did not install incinerators necessary to comply with regulation 19 because it believed that Oce would turn down the request for the expenditure and perhaps shut down Arkwright's operations. *Id.* at Exhibit G (Fish deposition at 110–14).

 The Court finds that the above-discussed factors demonstrate Oce's level of control over Arkwright to the extent necessary to make out a prima facie case of jurisdiction over Oce, and Oce therefore may not be dismissed from the lawsuit at this juncture.[6]

## II.

EPA's contention that Arkwright is liable under the Clean Air Act as a matter of law and Arkwright's counter motions to dismiss generate a series of legal issues. These issues are as follows:

 1. Does federal law require EPA to approve an SIP revision before it becomes law, even though the revision has been accepted by the State?

2. If an SIP revision requires EPA approval, must a subject company comply with the original SIP deadlines until EPA approves the revision?

3. Does the Act require EPA to respond to SIP modification proposals within four

months of submission? If so, and EPA fails to respond within the four months, may EPA still impose penalties and obtain injunctive relief against a violator for its noncompliance with original SIP deadlines?

4. If the Act requires EPA to respond to SIP modification proposals within four months, and EPA does not do so, is EPA precluded from enforcing the Act under the doctrine of equitable estoppel?

5. Assuming a defendant is found liable as a matter of law, is EPA precluded from collecting penalties for the period between the expiration of EPA's alleged four-month SIP revision review deadline and the date EPA finally rejected the proposal?

The Court addresses these issues seriatim.

### 1. Must EPA approve an SIP revision before the revision becomes law?

Arkwright contends that the consent agreement negotiated with RIDEM does not have to be approved by EPA to be valid. Under Rhode Island's federally-approved SIP, Regulation No. 19 allows RIDEM to authorize revisions on a case-by-case basis. Regulation No. 19 §§ 19.3.3 and 19.4. This state regulation notwithstanding, provisions of the Clear Air Act, EPA's administrative rules, as well as case law in this circuit and throughout the country, acknowledge EPA's final authority to approve or reject an SIP revision.

The Clean Air Act permits state implementation plan modification. 42 U.S.C. § 7410(a)(3) and (i). The Act states, "The [EPA] Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirement of paragraph (2) and has been adopted by the

---

**6.** When a motion to dismiss for lack of personal jurisdiction is denied at a preliminary stage of the proceedings, prior to hearing, the moving party is free to renew the motion at trial, where it is ultimately the plaintiff's burden to demonstrate that jurisdiction over the defendant exists by a preponderance of the evidence. *Marine Midland, supra,* 664 at 904; *Moore's* at ¶ 12.07(2.–2). However, in this case, plaintiff has moved for summary judgment against Arkwright and Oce on the merits of the case. To prevail on summary judgment when the defend-

ant contests personal jurisdiction, the plaintiff must demonstrate that there is no genuine issue as to any material fact on the jurisdictional question. *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983). The Government has not met this burden here. As set forth above, most of the facts regarding the issue of Oce's control over Arkwright are in dispute. Because there are genuine issues of material fact, summary judgment as to Oce is inappropriate. Accordingly, EPA's motion for summary judgment as to Oce must be denied.

state...." 42 U.S.C. § 7410(a)(3)(A). Further, EPA's published rules provide that SIP revisions are not considered part of that plan until the Administrator has approved the revisions. 40 C.F.R. § 51.8 (1986).

EPA's reviewing authority has been recognized by the United States Supreme Court, *Train v. Natural Resources Defense Council* ("NRDC"), 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975), and the First Circuit, *NRDC v. EPA*, 478 F.2d 875, 888 (1st Cir.1973), as well as most of the other circuits, see, e.g., *Council of Commuter Organizations v. Gorsuch*, 683 F.2d 648, 650 (2d Cir.1982); *American Cyanamid Co. v. EPA*, 810 F.2d 493, 495 (5th Cir.1987). In *NRDC v. EPA*, a suit for review of an EPA decision disapproving portions of Rhode Island's original air pollution implementation plan, the Court explicitly held:

> [T]hese statutory provisions not only empower, but also require the Administrator to disapprove state statutes and regulations, or portions thereof, which are not in accordance with the requirements of the Clean Air Amendments. Congress plainly intended the federal statute and regulations promulgated thereunder to take precedence over state laws and regulations.

*NRDC v. EPA, supra,* 478 F.2d at 888 (citing 42 U.S.C. § 1857c–8(a)(1), *amended by* 42 U.S.C. § 7413).

Therefore, even though Rhode Island's Regulation No. 19 permits the state to relax its air pollution SIP standards in individual cases, nothing in the approved regulation legally waives EPA's obligation to review RIDEM's modification. Accordingly, because the consent agreement negotiated between Rhode Island and the Arkwright corporation incorporates exceptions to the original SIP, the agreement must be approved by EPA as a matter of law.

*2. Compliance with original SIP deadlines pending EPA approval of revision.*

■ Arkwright argues that as long as it is in compliance with the State's consent agreement, EPA cannot cite it for violating the Act until EPA either accepts or rejects the proposed SIP modifications. Defendant Arkwright's Motion to Dismiss [hereinafter "Motion to Dismiss"] at 8–11. Arkwright argues that EPA's policy to hold the company to the original SIP standards even though the State has approved new ones clashes with congressional intent that federal and state agencies share responsibility for improving air quality. *See American Cyanamid, supra,* 810 F.2d at 501. Arkwright's position is bolstered by *American Cyanamid,* in which the court emphasized that:

> The EPA's interpretation of § 7420 exposes ... companies to the unacceptable risk that, contrary to state policy decisions authorized under the Act, they will be fined because of delays within the EPA.

*Id.*

However, the Supreme Court specifically addressed this issue in *Train,* holding that "a polluter is subject to existing requirements until such time as he obtains a variance, and variances are not available ... until they have been approved by *both* the State and the Agency." *Train, supra,* 421 U.S. at 92, 95 S.Ct. at 1488 (emphasis added); *see also Duquesne Light Co. v. EPA,* 698 F.2d 456, 471 (D.C.Cir.1983) (current SIP's remain in force until EPA formally approves revision); *NRDC v. EPA,* 507 F.2d 905, 915 (9th Cir.1974).

Accordingly, Arkwright must comply with the original Regulation No. 19 emission standards until EPA formally approves a revision.

*3. EPA review deadlines.*

■ EPA received RIDEM's proposed SIP modification on November 18, 1985. On August 1, 1986, EPA issued a proposed rejection of Arkwright's consent agreement, but did not publish a formal disapproval until October 19, 1987. Defendant argues that this two-year delay precludes EPA sanctions against Arkwright. Plaintiff argues that EPA is not required to respond to proposed modifications within a time certain.

Section 110(a)(3)(A) of the Act states that the Administrator shall approve a proposed

SIP revision if it meets the requirements of paragraph 2. 42 U.S.C. § 7410(a)(3)(A). Paragraph 2, which applies to approval of general state plans, rather than to revisions, states the following:

The Administrator shall, within *four* months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof....

*Id.* § 7410(a)(2) (emphasis added). Whether the four-month deadline mandated by section 7410(a)(2) applies to revisions as well as to general plans has not yet been addressed by the Supreme Court or the First Circuit, and there is a split within the other circuits as to the section 7410(a)(2) deadline and its impact on EPA's enforcement power while SIP revision proposals are outstanding.

The Sixth Circuit rejects the four-month deadline for SIP revisions, holding that section 110(a)(2) only requires EPA action within four months on general state implementation plans, not for SIP revisions submitted under section 110(a)(3)(A)). *United States v. National Steel Corp.,* 767 F.2d 1176, 1182 n. 1 (6th Cir.1985). In contrast, the Fifth Circuit recently held that the Act not only requires EPA to respond to SIP revision proposals within four months, but also that the agency is barred from commencing penalty proceedings until it renders a final decision. *American Cyanamid, supra,* 810 F.2d at 495, 500. The D.C. and Second Circuits, while holding that proposed revisions must be acted upon by EPA within four months, have not barred EPA from exercising its duties for failure to meet the deadline. *Duquesne, supra,* 698 F.2d at 471; *Council of Commuter Organizations v. Thomas,* 799 F.2d 879, 888 (2d Cir.1986); *see also Gorsuch,* 683 F.2d at 650 (three-year delay in responding to SIP revision "inexcusable", but not grounds for overturning EPA's final approval).

The Court further notes that the Act does not provide for the imposition of a penalty or waiver of rights if EPA fails to abide by the deadline. An established rule of statutory construction is that "[t]he

Court in giving effect to the underlying policy of the statute, should not, by judicial implication, read into the express terms of the statute...." *Occidental Life Ins. Co. of Cal. v. Fried,* 245 F.Supp. 211, 217 (D.Conn.1965). Finally, the Court recognizes that the D.C. Circuit Court's interpretation of the rules governing section 7420 actions carries particular weight because the statute expressly provides that petitions for review of section 7420 EPA actions may *only* be filed in the D.C. Circuit Court of Appeals. 42 U.S.C. § 7607(b)(1). Therefore, this Court holds that EPA's failure to approve or disapprove the defendant's proposed consent agreement within four months does not bar simultaneous EPA noncompliance enforcement proceedings.

*4. Equitable estoppel.*

Arkwright raises the defense of equitable estoppel, contending that the company's reliance to its detriment upon two grounds of government misconduct entitles it to estop EPA from imposing civil penalties. EPA argues that Arkwright fails to establish the requisite elements to support estoppel against a government agency.

Traditionally, courts in the United States refused to recognize equitable estoppel claims against the Government or any of its agencies under the doctrine of sovereign immunity. *Portmann v. United States,* 674 F.2d 1155, 1158–59 (7th Cir.1982) (citing 2 K. Davis, *Administrative Law Treatise* § 17.01 at 491–92 (1958); *United States v. Georgia–Pacific Co.,* 421 F.2d 92, 99 (9th Cir.1970)). However, the Supreme Court and the First Circuit have recently indicated that the doctrine now permits such claims. *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); *Best v. Stetson,* 691 F.2d 42, 44 (1st Cir.1982).

■ To sustain its burden in an estoppel claim, the defendant must first prove the Government's affirmative misconduct and Arkwright's reasonable reliance on that misconduct to its detriment. *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985); *Akbarin v. INS,* 669 F.2d

839, 842 (1st Cir.1982); *Best, supra,* 691 F.2d at 44. If Arkwright can establish these elements, then the Court must weigh Arkwright's right to equitable relief against the public interest in the outcome of the suit. *Heckler, supra,* 467 U.S. at 60–61, 104 S.Ct. at 2224–25; *Best, supra,* 691 F.2d at 44; *Akbarin supra,* 669 F.2d at 844; *Citizens Savings Bank v. Bell,* 605 F.Supp. 1033, 1044 (D.R.I.1985).

Arkwright claims that EPA never told the consultant hired to evaluate the company's ability to conform to the original SIP that its protocols were unacceptable and that this effectively misled Arkwright to believe that EPA would adopt the consultant's findings. As a result, Arkwright contends it relied on these conclusions to negotiate and adopt the consent agreement emissions plan. Furthermore, Arkwright argues that because EPA took longer than four months to reject the proposed SIP modification based on the consultant's conclusions, Arkwright complied with an invalid consent agreement. Defendant's Objection to Summary Judgment at 10–11. In essence, Arkwright claims that it reasonably construed EPA's silence as approval for the SIP revision and relied thereon to its detriment, not only by incurring substantial expenses complying with an unacceptable plan, but also by exposing itself to potentially severe civil penalty liability. *See* 42 U.S.C. § 7413(b). EPA argues that the Agency's "silence" did not amount to the sort of affirmative misconduct upon which Arkwright should reasonably have relied.

■ Federal courts have refused to regard the Government's failure to act as affirmative misconduct. *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982) (INS failure to process a resident status application promptly (18 months) fell short of affirmative misconduct); *INS v. Hibi,* 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (failure to inform plaintiff of his rights under the 1940 Nationality Act was not affirmative misconduct); *Precious Metals Associates v. Commodity Future Trading Comm'n,* 620 F.2d 900, 909 (1st Cir.1980) (government agency's failure to respond to inquiries did not amount to estoppel conduct). The First Circuit has stated that "neither carelessness ... nor a reluctance to be of assistance ... [is] tantamount to affirmative misbehavior." *Ven–Fuel, supra,* 758 F.2d at 761 (citations omitted). In the instant case, no one within EPA ever stated that EPA would abide by the consultant's findings. Plaintiff's Motion at 35. Accordingly, the Court finds that EPA's inaction does not amount to affirmative misconduct.

■ Furthermore, even assuming, arguendo, that the consultant was an EPA agent, Arkwright's reliance on the study's conclusions was unreasonable. Arkwright should have realized that an SIP revision based on a government-funded private consultant's conclusions was still unauthorized without the Administrator's formal approval. The Act expressly reserves the power to approve modified SIPs to the EPA Administrator. 42 U.S.C. § 7410(a)(3)(A). "[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law." *Heckler, supra,* 467 U.S. at 63, 104 S.Ct. at 2225.

■ Finally, the Court denies defendant's estoppel claim for public policy reasons. Congress has expressed its desire to encourage states and the federal government to share responsibility for attaining the NAAQS. *American Cyanamid, supra,* 810 F.2d at 500; *Duquesne, supra,* 698 F.2d at 471. The underlying public policy of the Clean Air Act and its amendments is the prompt reduction of air pollution to protect the public health. *Train, supra,* 421 U.S. at 98, 95 S.Ct. at 1490–91. If EPA cannot penalize companies which violate approved air quality standards, then the general populace will suffer from unhealthy air pollution levels.

Given the facts and public policy considerations underlying this case, the Court finds no ground to sustain Arkwright's defense of equitable estoppel.

*5. Civil penalties.*

■ Arkwright asks the Court to prohibit EPA from collecting civil penalties for

the period between four months after the consent agreement was submitted as a proposed SIP modification and October 19, 1987, the date the Government published its final disapproval of the modification.

Both the Fifth and D.C. Circuits have ruled on the appropriate formula for imposing penalties against a company which violated the Clean Air Act while its proposed SIP revision was pending. In *American Cyanamid,* the defendant had submitted a proposed SIP modificaton to EPA more than four months before it was to comply with the original SIP deadline. 810 F.2d at 497–98, n. 5. Although EPA failed to respond to the proposal, it issued a notice of violation to the company. *Id.* The Fifth Circuit held that EPA could not collect a penalty for the period between four months after submission of the proposed revision and the date EPA rejected the proposal. *Id.* at 500. The *American Cyanamid* court felt that Congress imposed a four-month deadline on EPA review of these SIP revisions because it intended EPA to act promptly in enforcing the Act, and if EPA could collect fines during this period of inactivity, there would be no incentive for the agency to abide by section 7410's four-month rule. *Id.* at 499. Additionally, the Fifth Circuit emphasized that after a long delay, EPA might be enticed to reject an SIP revision because of the large cumulative penalty at stake, rather than objectively administering the Act. *Id.*

The D.C. Circuit took a different approach. Under its statutory mandate, the D.C. Circuit Court of Appeals was petitioned to review EPA's policy of imposing civil penalties against violators of the Act, even though sources were in compliance with a pending SIP modification proposal, and even though EPA had not acted on those proposals within the four months mandated by the Act. *Duquesne, supra,* 698 F.2d at 466. The court of appeals held that in order to protect a source which is in compliance with the air quality standards, noncompliance penalties must be held in abeyance until EPA makes a final decision on the proposal. *Id.* at 472. However, to "remove any economic benefit accruing to a source not in compliance with the law if the SIP revision is not approved," the court ruled that EPA could levy a penalty including interest retroactive to the expiraton of EPA's four-month review deadline. *Id.* The *Duquesne* court noted that to hold otherwise would allow companies and states to circumvent the Act by proposing revisions to their SIP's. *Id.* at 471 (*see Ohio Environmental Council v. United States District Court,* 565 F.2d 393, 398 (6th Cir.1977)).

The parties have advanced similar arguments in the instant case. EPA emphasizes congressional concern for penalizing Clean Air Act violators as an incentive for compliance with air pollution guidelines. Arkwright decries the unfair burden it must bear while waiting for EPA to accept or reject a state-approved alternate plan.

The Court believes that the *Duquesne* decision strikes a fair balance between these two positions. EPA found that Arkwright's consent agreement was not an acceptable alternative to the current Rhode Island SIP. Arkwright's noncompliance should not be rewarded by waiving the statutory penalties during EPA's 18–month review period. The company risked EPA's rejection when it opted to follow the unauthorized consent agreement instead of the approved plan under Regulation No. 19. Arkwright lost the gamble and is now liable for back penalties.

However, like the *Duquesne* court, the Court also recognizes EPA's statutory obligation to respond to a pending SIP proposal within four months under 42 U.S.C. § 7410(a)(3). The Court finds that because the proposal was submitted before the agency issued its notice of violation, EPA must wait until it rejects the proposal to begin calculating retroactive penalties.[7]

■■■ As to the proper amount of a penalty to be imposed, EPA should consider Arkwright's efforts to comply with the air

---

7. In the instant case, EPA could begin its retroactive penalty calculations on October 19, 1987, when its final rejection of the SIP was published. Arkwright's liability extends no farther back than March 19, 1986, four months after submission of the proposed consent agreement.

quality standards under the consent agreement. Expenditures made by a source for the purpose of bringing the company into compliance with NAAQS are to be credited against the penalty assessment. 42 U.S.C. § 7420(d)(2)(B). At least one court has suggested that a company's cooperation with the state should also affect the amount of civil penalty levied, even though an agreement between the defendant and the state does not affect the underlying liability. *United States v. Harford Sands, Inc.*, 575 F.Supp. 733, 735 (D.Md.1983) (EPA suit for injunction and civil penalty against company for violating Clean Air Act).

In sum, EPA has the authority to disapprove defendant's consent agreement proposal as a modification to Rhode Island's SIP, and Arkwright is obliged to comply with the original SIP deadline of July 1985 until EPA approves a change. Although the Clean Air Act requires EPA to approve or disapprove Arkwright's proposed modification within four months of submission, EPA's failure to meet this deadline does not bar enforcement of the Act. Finally, Arkwright has violated the SIP by being in noncompliance after the deadline, and, under the circumstances of this case, the Government is not estopped from imposing civil penalties against Arkwright after March 19, 1986. Accordingly, Arkwright's motion to dismiss the Government's charges (document no. 11) is denied.

### Conclusion

For the aforementioned reasons, the Court denies defendant's motion to dismiss (document no. 11), denies plaintiff's request for oral argument (document no. 14), grants plaintiff's motion for partial summary judgment (document no. 15) as to Arkwright, and denies said motion as to Oce.

SO ORDERED.